[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] DECISION
This is an action to compel specific performance by Defendant Global Telecommunications, LLC (hereafter "Global" or "Defendant") of an Asset Acquisition Agreement (the "Agreement") between Global and Plaintiff Tower Ventures II (hereafter "Tower" or "Plaintiff") entered on September 10, 2002. The complaint also seeks an award of compensatory damages. In addition, Plaintiff has filed a motion for a preliminary injunction to enjoin the Defendant from transferring, agreeing to transfer, or negotiating the possible transfer of any of the assets which are the subject of the Agreement, pending trial on the merits of the claim for specific performance and breach of contract. The Agreement contemplates the purchase and sale, inter alia, of a leasehold interest in real property located in the Town of Southwick, Massachusetts, and a special permit for the construction of a wireless telecommunications tower to be located on the property.
This matter has been assigned to the Business Calendar. On February 20, 2004 this Court issued a temporary restraining order which enjoined the Defendant from selling the assets contemplated in the Agreement to anyone other than Tower. In exchange, Tower was required by the Order to deposit $75,000 in a separate account to serve as security in connection with the issuance of the restraining order. The parties have complied with the restraining order, and have agreed that the Order remains in full force and effect pending the Court's hearing on preliminary injunction, and determination thereon.
 I. FINDINGS OF FACT
The matter is now before the Court on the Plaintiff's motion for a preliminary injunction, and the Defendant's objection thereto. For purposes of this hearing, the parties have agreed and stipulated to all of the facts pertinent to the Court's consideration. Those facts are adopted by the Court as the Court's findings of fact in connection with the determination of the motion for preliminary injunction, and are attached hereto as Appendix A. The facts are also incorporated herein by reference in accordance with the provisions of RCP 52(a).
 II. CONCLUSIONS OF LAW
The Agreement provides that the Agreement shall be governed and construed in accordance with Massachusetts law. See Agreement, Section 11(c). Although it is not clear whether that provision requires this Court to look to Massachusetts law for the governing standard relative to issuance of the relief herein requested, for purposes of this hearing it appears that there is no material difference between Massachusetts and Rhode Island law relative to the standard to be applied in considering a motion for preliminary injunctive relief.
In deciding whether to issue a preliminary injunction, the hearing justice should determine whether the moving party has demonstrated a reasonable likelihood of success on the merits; will suffer irreparable harm without the requested injunctive relief; can demonstrate that the balance of equities, including possible hardships to each party, tip in favor of the moving party; and has shown that a preliminary injunction will preserve the status quo. Compare DiDonato v. Kennedy, 822 A.2d 179
(R.I. 2003), with Packaging Industries Group, Inc. v. Cheney,380 Mass. 609, 617, 405 N.E.2d 106 (1980). Even though money damages may be available, specific performance is generally considered an appropriate remedy with respect to contracts to convey an interest in land Greenfield Country Estates Tenants'Assoc. v. Deep, 666 N.E.2d 988 (Mass. 1966).
However, specific performance is recognized as discretionary with the trial justice, and countervailing equities may render an award of specific performance inappropriate. See McCarthy v.Tobin, 429 Mass. 84, 89 (1999). If the Plaintiff is unable to establish a reasonable likelihood that it will ultimately prevail on the merits, the Court should be reluctant to issue a preliminary injunction, when the remaining factors are somewhat equally balanced between the plaintiff and the defendant.[1] In this case, each party claims it will be harmed if it does not receive the benefit of what each believes to be the bargain of the Agreement. Thus, the equities seem to be evenly balanced between the Plaintiff, who claims an entitlement to the assets at the agreed price, and the Defendant, who believes it has the right to terminate this Agreement and seek out a buyer willing to pay a higher price for the assets. Accordingly, in this case, the determinative factor is the likelihood of success on the merits. The Court believes that the Plaintiff is unable to demonstrate a reasonable likelihood of establishing the necessary showing of breach of contract which would be a necessary component of establishing an entitlement to specific performance.
The key issue to consider relative to the Plaintiff's likelihood of success is to determine whether the Defendant acted contrary to the express terms of the contract when it notified the Plaintiff on February 10, 2004, that it was exercising its rights to terminate the Agreement under Section 1.5 thereof.[2] By the express and unambiguous terms of that Section, either party to the Agreement could unilaterally exercise a right to terminate "so long as the terminating party is not then in material breach of this Agreement." Based upon the agreed facts, the Plaintiff argues that the Defendant, on February 10, 2004, was in material breach of the Agreement, in that the Defendant was at that time allegedly acting in violation of the implied covenant of good faith and fair dealing, which is an implied term contained in every contract governed by Massachusetts law.[3]
The facts upon which the Plaintiff relies to establish that the Defendant was in material breach of the Agreement on the date of its purported termination are set forth in Paragraphs 21 through 26 of the Stipulation. It is clear from those paragraphs that beginning in early to mid January 2004, representatives of Global engaged in discussions with two principals of a company known as Optasite, Inc. concerning the possible sale of several tower sites. During these conversations, the Southwick site was not discussed. However, in early February, Global discussed the possible sale of the Southwick site to Optasite, and had discussions concerning a possible price, notwithstanding that the Southwick site was then under agreement for sale to Tower. On February 6, 2004, Global telephoned Tower and indicated that it was their intention not to go forward with the sale of assets to Tower, and notified Tower that they had identified another purchaser who was willing to pay more than twice the price as was set forth in the Agreement with Tower. Thereafter, on February 10, 2004, Global's counsel telephoned counsel for Tower to restate Global's intention to terminate the Agreement, but indicated that Global would consider a new agreement with Tower, if Tower would agree to increase the purchase price for the assets to $300,000. Both Global's exercise of the termination clause, as well as the offer to enter a new agreement to sell the assets to Tower, were confirmed in writing in a letter sent by first class mail and fax later that day. A copy of that letter has been marked as Exhibit B to the agreed statement of facts.
The Agreement was structured by the parties anticipating that there may be some delay between the time the Agreement was entered and the time when a closing could occur. The closing was not set for a fixed date, but was structured to take place "on the tenth business day after all of the conditions set forth in Article 7 hereof have been satisfied."[4] The parties further agreed to an "Outside Closing Date" of January 30, 2003. Thus the parties agreed that neither party was obligated to wait indefinitely for the occurrence of the conditions precedent to Tower's obligation to purchase. Either party could unilaterally terminate the Agreement after the Outside Closing Date as long as the terminating party was not in material breach at the time of the exercise of the right to terminate.
Despite what everyone agrees to have been Global's best efforts to obtain the necessary permits and licenses,[5] the Massachusetts Historical Commission ("MHC") requested a full archaeological survey of the proposed tower site. In addition, other unexpected delays resulted in the Outside Closing Date passing without all of the necessary approvals having been obtained that would have triggered a closing date. See
Stipulation of Facts, ¶¶ 14-20. Although Tower requested on two occasions in 2003 that the Outside Closing Date be extended, Global declined to execute the proposed amendments. Accordingly, at any time after January 30, 2003, either party, for any reason, could terminate the Agreement.
Plaintiff relies on the Anthony's Pier Four case to suggest that at the time Global purported to exercise its termination rights, Global, as seller, was in material breach of the Agreement, in that it had acted contrary to the implied covenant of good faith and fair dealing by discussing a possible sale of the assets to another buyer, Optasite. The Court disagrees. In the Anthony's Pier Four case, the Court found that the seller, in its attempts to command a higher price for the development contract, improperly attempted to invoke a provision allowing the seller to disapprove development plans and cancel the deal. The Court found that the attempted disapproval of the design was contrary to earlier actions of the seller, and was nothing more than a pretext to extort more money from the buyer. Anthony'sPier Four, 583 N.E.2d at 820-21.
In the instant case, the seller, Global, acted above board and consistent with the bargained for right to terminate after the Outside Closing Date. Global, at no time prior to the letter of termination of February 10, 2004, entered into a sales agreement with Optasite or any other entity that would constitute an interference with the contract rights as between Global and Tower Ventures. There was no attempt by Global to delay approvals in order gain an extortionate bargaining position with the buyer. To the contrary, Global did nothing more than act in a commercially prudent manner to test the marketplace water before it jumped into the termination pool. Had the unexpected delay resulting from the regulatory process occasioned a decline in the value of the assets, the Buyer would have had the identical right to walk away from the deal with impunity. That was the precise deal that became incorporated into the Agreement, and I cannot find that the Buyer, Tower Ventures, stands a reasonable likelihood of succeeding on the merits of its claim, based upon the stipulated record before the Court. Were this Court to hold otherwise, the result would be to imply a provision that would read out of the Agreement the Outside Closing Date, which was a clear and unambiguous statement of the parties' intentions.
 III. CONCLUSION
For the foregoing reasons, the motion of the Plaintiff for issuance of a preliminary injunction is denied, and the temporary restraining order previously entered is vacated. The parties shall present an order.
[1] "What maters as to each party is not the raw amount of irreparable harm the party might conceivably suffer, but rather the risk of such harm in light of the party's chance of success on the merits. Only where the balance between these risks cuts in favor of the moving party may a preliminary injunction properly issue." Packing Industries Group, Inc. v. Cheney, 380 Mass. at 617, 495 N.E.2d at 112.
[2] Section 1.5 of the Agreement reads as follows:
 "Closing Date and Place. The closing of the purchase and sale of the Assets (the "Closing") shall take place at the offices of Purchaser in Providence, Rhode Island, or by mail, on the tenth business day after all of the conditions set forth at Article 7 hereof have been satisfied. If the Closing has not occurred by January 30, 2003 (the "Outside Closing Date"), then either Purchaser or Seller may terminate this Agreement so long as the terminating party is not then in material breach of this Agreement."
[3] "Every contract . . . implies good faith and fair dealing between the parties to it." Anthony's Pier Four, Inc. v. HBCAssociates, 411 Mass. 451, 471, 583 N.E.2d 806, 820 (1991) (citing Warner Ins. Co. v. Comm'n of Ins., 406 Mass. 354, 362 n. 9, 548 N.E.2d 188 (1990)). The implied covenant of good faith and fair dealing provides that "neither party shall do anything that will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract . . ."Drucker v. Roland Wm. Jutras Assocs., 370 Mass. 383, 385,348 N.E.2d 763 (1976). In the Anthony's Pier Four case, the judge concluded that Anthony's purported disapproval of the BRA master plan destroyed or injured HBC's right to receive the fruits of the contract and thus violated the implied covenant of good faith and fair dealing. 411 Mass. at 471, 583 N.E.2d at 820.
[4] Pursuant to Section 7 of the Agreement, Tower had no obligation to close unless all of the conditions of Section 7 were satisfied. Those conditions included performance by the Seller, Global, of its obligations under Section 5 to obtain all necessary permits and approvals necessary to construct and operate the tower on the leased premises.
[5] At the hearing, the Court posed the following question to counsel for the Plaintiff: "Is there an allegation, Mr. Spigle, or any facts that would support an allegation that the seller here did not move with all deliberate speed to obtain the necessary permits?" Counsel for the Plaintiff responded: "There is no such allegation. In fact, I think you'll see from the stipulation that they were working to get it resolved, and Tower Ventures always assisted in that process. Everybody wanted to get it resolved. Everybody tried to get it resolved." Tr. at 47.